UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE SUNO DATA BREACH LITIGATION<br><br>This document relates to:<br>All Actions. | Civil Action No. 1:26-cv-13400-ADB<br><br>**JURY TRIAL DEMANDED** |

# CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiff Randy Anglin ("Plaintiff" or "Anglin"), individually and on behalf of all others similarly situated, brings this Consolidated Amended Class Action Complaint against Defendant Suno, Inc. ("Suno" or "Defendant")[1]. Plaintiff alleges matters concerning his own experiences on personal knowledge and other matters on information and belief based on counsel's investigation, the records supplied by Plaintiff and the public sources identified below. Allegations concerning Suno's internal systems and the attackers' use of the stolen information are pleaded on information and belief.

## NATURE OF THE CASE

1. Plaintiff brings this class action against Defendant Suno for its failure to properly secure and safeguard Plaintiff's and other similarly situated individuals' ("Class Members") personally identifying information, including names, physical addresses, email addresses, phone numbers, purchases, and partial payment card information such as card type, expiration date and last four digits (collectively "PII" or "Private Information").[2]

[1] Plaintiffs Alec Pilavian and Frank Richard Rugnetta have withdrawn from the litigation and Plaintiff Randy Anglin is the named plaintiff for the operative Consolidated Amended Class Action Complaint.

[2] *Suno Data Breach*, Have I Been Pwned, https://haveibeenpwned.com/Breach/Suno (last accessed November 24, 2026)

2. Suno is a generative AI platform that creates complete, original songs from simple text prompts, allowing users to create full audio tracks in under a minute.

3. Plaintiff and Class Members are individuals whose Private Information was directly and/or indirectly provided to Defendant. By collecting, storing, and maintaining Plaintiff's and Class Members' Private Information, Suno has a resulting duty to secure, maintain, protect, and safeguard the Private Information that it collects and stores against unauthorized access and disclosure through reasonable and adequate data security measures.

4. Despite Suno's duty to safeguard the Private Information of Plaintiff and Class Members, their Private Information in Defendant's possession was compromised when an unauthorized party gained access to Defendant's network and exfiltrated the sensitive data of 55 million users in or about November 2025 (the "Data Breach").[3]

5. The Data Breach occurred when cybercriminals infiltrated Defendant's inadequately protected network servers and accessed highly sensitive PII that was being kept.

6. In response to the Data Breach, a spokesperson from Suno did not dispute the number of users affected and confirmed that the company experienced a security incident in November 2025.[4]

7. While Defendant claims to have discovered the breach as early as November 2025, victims were not informed of the Data Breach until July 20, 2026 when news outlets broke the news publicly.[5] Indeed, Plaintiff and Class Members were wholly unaware of the Data Breach for nine months and only learned of the Data Breach from outside sources, rather than from Defendant.

---

[3] *Id.*
[4] Zack Wittaker, *AI music generator Suno breach affects 55M users, per Have I Been Pwned,* Tech Crunch (July 21, 2026), https://techcrunch.com/2026/07/21/ai-music-generator-suno-breach-affects-55m-users-per-have-i-been-pwned/
[5] *Id.*

8. Defendant has not provided, and does not appear to have provided, any notice regarding the Data Breach.

9. Suno maintained the PII of Plaintiff and Class Members in a negligent and/or reckless manner. In particular, the PII was maintained on Suno's computer system and network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' PII was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure the PII from those risks left that property in a dangerous condition.

10. Defendant disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, and/or negligently failing to implement adequate and reasonable measures to ensure that Plaintiff's and Class Members' PII was safeguarded, failing to take available steps to prevent unauthorized disclosure of data and failing to follow applicable, required and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use.

11. As a result, Plaintiff's and Class Members' PII was compromised by an unauthorized third-party. Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe and are entitled to injunctive and other equitable relief.

12. As a direct and proximate result of Defendant's failure to implement and follow basic security procedures, Plaintiff's and Class Members' Private Information is now in the hands of cybercriminals.

13. Plaintiff and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, intrusion of their privacy, and similar forms of criminal mischief, risk which may last for the rest of their lives. Consequently, Plaintiff and Class Members

must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

14. Plaintiff, on behalf of himself and all others similarly situated, alleges claims for negligence, breach of implied contract, unjust enrichment and declaratory judgment arising from the Data Breach. Plaintiff seeks damages and injunctive relief, including the adoption of reasonably sufficient practices to safeguard the Private Information in Defendant's custody to prevent incidents like the Data Breach from reoccurring in the future, and for Defendant to provide identity theft protective services to Plaintiff and Class Members for their lifetimes.

## PARTIES

15. Plaintiff Randy Anglin is an adult domiciled in Kendallville, Indiana, and is a citizen of Indiana. He was domiciled there when the events concerning him described in this Complaint occurred.

16. Plaintiff used his credit card to purchase his Suno subscription. On information and belief, the compromised records included his contact and payment-related information.

17. Plaintiff has suffered actual injury from having his Private Information exposed and/or stolen as a result of the Data Breach, including: (a) fraudulent charges on his account; (b) required mitigation efforts, including researching the Data Breach and needing to monitor his financial statements to ensure his information is not used for identity theft and fraud; (c) damages to and diminution of the value of his Private Information, a form of intangible property that loses value when it falls into the hands of criminals; (d) loss of privacy; and (e) continuous imminent and impending injury arising from increased risk of financial identity theft and fraud.

18. As a result of the Data Breach, and the sensitivity of the Private Information compromised, Plaintiff will continue to be at a substantial and certainly impending risk for fraud and identity theft, and their attendant damages, for years to come.

19. Defendant Suno, Inc. is a Delaware corporation with its principal place of business at 17 Dunster Street, Cambridge, Massachusetts 02138.

20. Suno determined what account and billing information to collect or make available through its systems, which personnel and credentials could access that information, and how to respond to an unauthorized acquisition. Its use of outside payment processors did not eliminate its control over account records, billing metadata, and access credentials within its own possession or control.

## JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 or more members of the proposed class, and at least one member of the proposed class is a citizen of a state different than Defendant.

22. This Court has personal jurisdiction over Defendant because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District and Defendant maintains its principal place of business in this District.

23. Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District and Defendant maintains its principal place of business in this District.

## FACTUAL BACKGROUND

24. Defendant specializes generative AI music creation. Its platform allows users to generate full, studio-quality songs complete with vocals and instrumentation, without needing prior musical training.

25. Defendant offers a platform that generates music from user inputs. It administers registered accounts and offers paid subscriptions. Account administration and subscription billing require Suno to associate service activity with contact identifiers and payment-related records.

26. As a condition of obtaining Defendant's services, Plaintiff and Class Members directly or indirectly entrusted Suno with their sensitive Private Information.

27. Suno's account and billing records associate a subscriber's contact information with the subscriber's subscription and payment information. Suno's receipt and retention of those records foreseeably affect the registered user.

28. Suno's Privacy Notice, revised June 23, 2026, acknowledges collection of contact and billing-contact information, including names, addresses, email addresses, and telephone numbers, along with account, subscription-tier, and transaction information. It also describes use of information to investigate suspicious activity, secure the service, and communicate about security incidents.[6]

29. Plaintiff and Class Members value the confidentiality of their Private Information and, accordingly, have taken reasonable steps to maintain the confidentiality of their Private Information.

30. In entrusting their Private Information to Defendant, Plaintiff and Class Members reasonably expected that Defendant would safeguard their highly sensitive information.

---

[6] Suno, Inc., *Privacy Notice* (November 23, 2026), https://suno.com/privacy

31. Defendant had superior access to information concerning the design and security of its systems. Plaintiff could not inspect Suno's internal access permissions, source-code repositories, data exports, monitoring, or incident findings.

32. By obtaining, collecting, and storing Plaintiff's and Class Members' Private Information, Suno assumed equitable and legal duties to safeguard Plaintiff's and Class Members' highly sensitive information, to only use this information for business purposes, and to only make authorized disclosures.

33. Despite these duties, Suno failed to implement reasonable data security measures to protect Plaintiff's and Class Members' Private Information and ultimately allowed threat actors to breach its computer systems and exfiltrate Plaintiff's and Class Members' Private Information stored therein.

**THE VALUE OF PRIVATE INFORMATION AND EFFECTS OF UNAUTHORIZED DISCLOSURE**

34. Suno understood that the Private Information it collects was highly sensitive and of significant value to those who would use it for wrongful purposes.

35. Suno also knew that a breach of its computer systems, and exposure of the Private Information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose Private Information was compromised.

36. These risks are not theoretical; in recent years, numerous high-profile breaches have occurred at business such as Equifax, Facebook, Yahoo, Marriott, Anthem, and many others.

37. Private Information has considerable value and constitutes an enticing and well-known target for hackers. Hackers can easily sell stolen data as there has been a "proliferation of

open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[7]

38. As the Federal Trade Commission ("FTC") recognizes, identity thieves can use this information to commit an array of crimes including identity theft, and medical and financial fraud.[8] The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individual, businesses, and government entities in the U.S. In 2024 alone, there were 6,670 recorded breaches exposing more than 16.8 billion records - representing a 6% year-over-year increase in the United States compared to 2023.[9] This trend is mirrored in identity theft complaints, which doubled over a five-year span - from 3.2 million reports in 2019 to 6.5 million in 2024.[10]

39. Indeed, a 2022 poll of security executives predicted an increase in attacks over the next two years from "social engineering and ransomware" as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[11]

---

[7] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.

[8] *What To Know About Identity Theft*, FTC Consumer Advice (Sept. 2024), https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft.

[9] *2025 Global Threat Intelligence Report*, Flashpoint (Mar. 18, 2025), https://go.flashpoint.io/2025_GTIR

[10] *Facts & Statistics: Identity Theft and Cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited July 22, 2026).

[11] Chuck Brooks, *Alarming Cyber Statistics For Mid-Year 2022 That You Need to Know*, Forbes (June 3, 2022), https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864.

40. In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, 2024 had the second-highest number of data compromises in the U.S. in a single year since such instances began being tracked in 2005.[12]

41. Artificial Intelligence ("AI") is also reshaping the cybersecurity landscape. "AI-related [common vulnerabilities and exposures] have surged, with 2,130 disclosed in 2025 alone – a 34.6% year-over-year increase."[13] Further, 16% of all breaches in 2025 involved attackers using AI.[14]

42. Before this incident, federal guidance had identified basic safeguards for businesses maintaining personal information: limit collection and retention, restrict access, protect credentials, separate sensitive data, monitor access and transfers, oversee service providers, and prepare to respond to security incidents. The FTC's *Start with Security* guidance describes these measures and the risks created when source-code or database credentials permit access to consumer records.[15]

43. On information and belief, Suno failed to implement or reasonably operate one or more of appropriate safeguards for Suno's account and billing environment, allowing an unauthorized person to reach and acquire account and payment-related information. The acquired records and Suno's acknowledged incident support that inference.

---

[12] *Facts + Statistics: Identity theft and cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20, (last visited November 23, 2026).

[13] Peter Girnus et al., *Fault Lines in the AI Ecosystem: TrendAI State of AI Security Report*, Trend Micro (Mar. 3, 2026), https://www.trendmicro.com/vinfo/us/security/news/threat-landscape/fault-lines-in-the-ai-ecosystem-trendai-state-of-ai-security-report

[14] *Cost of a Data Breach Report 2025*, IBM (2025), https://www.ibm.com/downloads/documents/us-en/131cf87b20b31c91 (last accessed November 23, 2026)

[15] Fed. Trade Comm'n, *Start with Security: A Guide for Business* (Aug. 2023), https://www.ftc.gov/business-guidance/resources/start-security-guide-business.

44. The resulting risk included social engineering. A name or address tied to a particular payment relationship can help an imposter select a victim and appear informed about that person's financial affairs. Partial card information can add credibility even when it cannot itself be used to complete a purchase.

45. In April 2022, the FBI warned that criminals impersonating financial-institution fraud departments use background information, including addresses and partial account identifiers, to convince people to follow purported fraud-response instructions. The FBI also explained that data breaches supply personal information that can be reused in scams. This warning predates the Suno incident.[16]

46. A perpetrator can use one set of compromised information to obtain another. For example, a caller who reaches a subscriber associated with a paying account and presents a convincing fraud-department story can induce disclosure of the remaining card information under the guise of confirming identity. The original dataset need not contain every digit later used in a fraudulent transaction for the original disclosure to facilitate that fraud.

47. Suno knew or should have known that these risks extended to its subscribers whose contact and payment information it maintained.

48. The ramifications of Suno’s failure to keep Plaintiff’s and Class Members’ Private Information secure are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: “[I]n some

---

[16] Fed. Bureau of Investigation, Internet Crime Complaint Ctr., *Cybercriminals Trick Victims into Transferring Funds to "Reverse" Instant Payments*, Alert No. I-041422-PSA (Apr. 14, 2022), https://www.ic3.gov/PSA/2022/PSA220414.

cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[17]

49. The exposure of highly sensitive personal information creates ongoing risk because "when highly sensitive types of data are exposed, the breach is only the beginning."[18] That risk persists as "[e]very breach feeds an underground ecosystem of exposed data. When attackers obtain highly sensitive identity credentials, they rarely use them just once. Instead, they combine information from multiple breaches to construct detailed identity profiles that can be exploited many time across different fraud scheme."[19]

50. Even if stolen Private Information does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

---

[17] *Report to Congressional Requesters, Personal Information, June 2007*, U.S. Gov't Accountability Office, https://www.gao.gov/new.items/d07737.pdf (last accessed November 23, 2026).

[18] Matt Cullina, *Small Breaches, Big Consequences*, Forbes (June 10, 2026), https://www.forbes.com/councils/forbesbusinesscouncil/2026/06/10/small-breaches-big-consequences/

[19] *Id.*

51. Although spear phishing attacks "make up only 0.1% of all email-based attacks," their outstanding impact is reflected in the fact that "2 out of 3 successful email attacks are spear phishing attacks that use personalized messages, social engineering, and other tactics."[20]

52. A company does not become less likely to experience another breach simply because it has already experienced one; to the contrary, "[o]nce hackers realize an organization is vulnerable to an attack, they will repeatedly attempt to breach its network[.]" Further, "95% of organizations surveyed by IBM between March 2022 and March 2023 said they had experienced more than on data breach."[21]

53. Other research indicates that "[t]wo-thirds of companies that experience cyberattack are hit again within a year. These successive incidents can play out in multiple ways: simultaneously, a few days apart, or many months later."[22]

54. "It can take an average of 277 days – that's about nine months – for an organization to identify and contain a breach. During that extended period of time, not only might cybercriminals remain in the environment wreaking havoc, but the means by which they entered remains available to others as well."[23]

55. The specific types of personal data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiff and other Class Members especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

---

[20] *Market Report: 2023 Spear-Phishing Trends*, Barracuda (May 24, 2023), https://assets.barracuda.com/assets/docs/dms/2023-spear-phishing-trends.pdf
[21] Beth Stackpole, *MIT Report Details New Cybersecurity Risks*, MIT Sloan (Apr. 30, 2024), https://mitsloan.mit.edu/ideas-made-to-matter/mit-report-details-new-cybersecurity-risks
[22] Neil Clauson, *When Cyberattackers Strike Again – and Again*, Mimecast (Nov. 13, 2024), https://www.mimecast.com/blog/when-cyberattackers-strike-again----and-again/
[23] *Id..; see also Cost of a Data Breach*, *supra* n.12.

56. Based on the value of Plaintiff's and Class Members' PII to cybercriminals, Suno knew or should have known the importance of safeguarding the PII entrusted to it and of the foreseeable consequences if its data security systems were breached. Suno failed, however, to take adequate cyber security measures to prevent the Data Breach from occurring.

**PLAINTIFF'S EXPERIENCE WITH DEFENDANT**

57. Plaintiff created a Suno account (the "Account") and maintained a paid subscription before the Data Breach.

58. Plaintiff had a paid Suno subscription by June 2025. A June 15, 2025 acknowledgment from Suno's billing support and the ensuing correspondence establish a billing relationship months before the November incident.

59. Plaintiff's credit card was used for subscription payments.

60. Have I Been Pwned ("HIBP") identifies the email address associated with the Account in the Data Breach. A search of that address identified Suno and no other breach listed in the search results.

61. On information and belief, Suno's records associated the subscription with Plaintiff's billing contact information and metadata concerning Plaintiff's credit card.

62. Before Plaintiff learned of the Data Breach, callers contacted him and impersonated the fraud department of the institution that issued the card used to pay Suno. On information and belief, the callers used his compromised contact and payment-related information to make the calls credible and induced disclosure of complete card information during purported identity verification. Unauthorized charges then appeared on the same card account.

63. On information and belief, records acquired in the Data Breach included Plaintiff's billing information and partial information identifying that card account. This allegation is

supported by the pre-breach subscription, the information supplied for it, the confirmed account-email match, the reported purchase-record component, and the targeted fraud-department impersonation that followed.

64. On information and belief, compromised contact and partial payment information enabled the impersonation, and the callers then obtained complete card information through purported identity verification. The public breach record concerns partial payment-card information; the complete card information was obtained through the subsequent deception.

65. In or about early June 2026, according to Plaintiff's present recollection, Plaintiff's landline began receiving calls purporting to come from the fraud department of the institution that issued the credit card used to pay Suno. The exact dates and times of the calls are not presently recalled. The approximate period preceded the unauthorized June and July transactions identified in Plaintiff's records.

66. At the time of these phishing calls, Suno had provided no warning that information associated with the account had been acquired by an unauthorized person.

67. The callers presented themselves as personnel acting to protect the card account against fraud. The calls appeared to concern the same card relationship used to pay Suno. Plaintiff did not understand that he was speaking with people attempting to obtain information for fraudulent use.

68. On information and belief, the callers possessed information originating in the Suno Data Breach that enabled them to identify Plaintiff, associate him with the relevant payment relationship, and make the impersonation credible.

69. On information and belief, during the purported identity-verification process, Plaintiff disclosed his complete card information to the callers in the mistaken belief that he was

dealing with legitimate fraud protection personnel. The complete card information was obtained through that deception.

70. Unauthorized charges thereafter appeared on the same credit-card account. Plaintiff identified unauthorized DoorDash transactions during June 2026 and reported additional suspicious transactions during July 2026. Plaintiff did not authorize the fraudulent purchases.

71. Plaintiff's current recollection places disputed transactions on or about June 19, 25, 27, and 30, 2026, and identifies additional Roku-related activity on or about July 19 and 20, 2026. These dates describe reported transactions and do not purport to fix the exact date of any phishing call. The unauthorized DoorDash charges provide specific examples of the financial misuse alleged here.

72. The card statement includes unauthorized DoorDash transactions and the Suno subscription charge. Some disputed transactions were credited or reversed. Plaintiff seeks compensation for the injuries he sustained, with appropriate credit for reimbursements.

73. The attackers' use of the compromised information caused unauthorized charges to appear on Plaintiff’s credit-card account. A later credit or reversal did not undo the acquisition and misuse of information concerning him and his credit-card account

74. The unauthorized use of Plaintiff’s credit card injured Plaintiff.

75. Plaintiff did not receive a notice from Suno warning of the Data Breach before the phishing calls and fraudulent charges. Plaintiff learned of the incident from other sources in July 2026.

76. Suno had the means to send billing messages to the account and continued processing subscription payments. An account-specific security warning could have identified the

types of information implicated, cautioned that a caller might use those details to impersonate a financial institution, and directed Plaintiff to contact the issuer through a verified number.

77. Had Plaintiff received a timely warning that his contact and payment-related information had been acquired, he would have treated unsolicited fraud-department calls with heightened suspicion and contacted the card issuer independently before providing complete card information. He also would have had the opportunity to ask the issuer about replacing the affected card and protecting the account before the reported misuse.

78. On information and belief, Suno's failure to warn deprived Plaintiff of that opportunity and materially increased the likelihood that the impersonation would succeed. This theory concerns the foreseeable consequences of withholding actionable information about a known security incident; it does not depend on an assertion that every statutory breach-notification definition necessarily covers every affected record.

**SUNO BREACHED ITS DUTY TO PROTECT PLAINTIFF'S AND CLASS MEMBERS' PRIVATE INFORMATION**

79. In or around November 2025, Suno was the target of a cybersecurity incident that compromised its data network.

80. The Private Information exfiltrated in the Data Breach includes individuals' names, physical addresses, email addresses, phone numbers, purchase histories, and partial credit card data.

81. Suno has not issued, and does not appear to have issued, any notification, or disclosure to affected individuals, regulatory authorities, or the public regarding the data breach, including any explanation of the scope, nature, or potential consequences of the compromise.

82. Based on Defendant's announcement of the Data Breach the cyberattack was expressly designed to gain access to private and confidential data of specific individuals, including

(among other things) the PII of Plaintiff and the Class Members and that the cybercriminals were successful in exfiltrating sensitive information from Defendant's data network.

83. All in all, the Private Information of approximately 55 million individuals was compromised in the Data Breach.

84. The Data Breach occurred as a direct result of Suno's failure to implement and follow basic security procedures to protect its current and former customers' Private Information that it had collected and stored.

**SUNO FAILED TO COMPLY WITH FTC GUIDELINES**

85. Suno is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

86. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[24]

87. Among other guidance, the FTC recommends the following cybersecurity guidelines for businesses in order to protect sensitive information in their systems: [25]

a. Identify all connections to the computers where sensitive information is stored;

b. Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks;

---

[24] *Start with Security – A Guide for Business*, United States Federal Trade Comm'n (Aug. 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/920a_start_with_security_en_aug2023_508_final_0.pdf

[25] *Protecting Personal Information: A Guide for Business*, United States Federal Trade Comm'n, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed November 23, 2026).

c. Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business;

d. Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine;

e. Pay particular attention to the security of their web applications - the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks;

f. Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet;

g. Determine whether a border firewall should be installed where the business' network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls -settings that determine which devices and traffic get through the firewall - to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically;

h. Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day; and

i. Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business's network, the transmission should be investigated to make sure it is authorized.

88. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity

on the network; and verify that third-party service providers have implemented reasonable security measures.[26]

89. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

90. Suno failed to properly implement basic data security practices. Suno's failure to employ reasonable and appropriate measures to protect against unauthorized access to its customers' PII constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

91. Suno was at all times fully aware of its obligations to protect the PII of its customers given the reams of PII that it had access to as Plaintiff's and the Class Members' service provider. Suno was also aware of the significant repercussions that would result from a failure to properly secure the Private Information it maintained.

**SUNO'S FAILURE TO PREVENT, IDENTIFY, AND TIMELY REPORT THE DATA BREACH**

92. Suno failed to take necessary precautions and failed to employ adequate measures necessary to protect its computer systems against unauthorized access and keep Plaintiff's and Class Members' Private Information secure.

93. The Private Information that Suno allowed to be exposed in the Data Breach is the type of private information that Suno knew or should have known would be the target of cyberattacks.

[26] *Id.*

94. Despite its own knowledge of the inherent risks of cyberattacks, and notwithstanding the FTC's data security principles and practices[27], Suno failed to disclose that its systems and security practices were inadequate to reasonably safeguard individuals' Private Information.

95. The FTC directs businesses to use an intrusion detection system to expose a breach as soon as it occurs, monitor activity for attempted hacks, and have an immediate response plan if a breach occurs.[28] Immediate notification to individuals impacted by a data breach is critical so that those impacted can take measures to protect themselves.

96. Here, Suno has acted inexcusably by failing to provide timely notice to the individuals whose personal information was compromised in the Data Breach, despite its knowledge of the incident and its obligations to safeguard such information.

97. Plaintiff and Class Members remain in the dark regarding what data was stolen, the particular malware used, and what steps are being taken to secure their PII in the future. Thus, Plaintiff and Class Members are left to speculate as to where their PII ended up, who has used it, and for what potentially nefarious purposes. Indeed, they are left to further speculate as to the full impact of the Data Breach and how Defendant intends to enhance its information security systems and monitoring capabilities to prevent further breaches.

---

[27] *Protecting Personal Information: A Guide for Business*, Fed. Trade Comm'n (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited July 22, 2026).

[28] *Id.*

**PLAINTIFF AND CLASS MEMBERS SUFFERED DAMAGES**

98. The ramifications of Suno's failure to keep Private Information secure are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

99. Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Defendant's conduct. Further, the value of Plaintiff's and Class Members' Private Information has been diminished by its exposure in the Data Breach.

100. PII remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, credit card information can be sold at a price ranging from $10 to $240, and bank details have a price range of $30 to $4,255[29] "Fullz" packages, which includes "extra information about the legitimate credit card owner in case" the scammer's "bona fides are challenged when they attempt to use the credit card" are also offered on the dark web.[30]

101. Plaintiff and Class Members are at substantial increased risk of suffering identity theft and fraud or misuse of their Private Information as a result of the Data Breach. A recent study found that "[v]ictims of identity theft (24%) were twice as likely as nonvictims (11%) to learn that an entity with their personal information experienced a data breach in the past year."[31]

---

[29] Ben Luthi, *Here's What Your Data Sells for on the Dark Web*, Experian (June 30, 2025), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/

[30] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, Armor (Apr. 3, 2018), https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/.

[31] Erika Harrell, *Just the Stats: Data Breach Notifications and Identity Theft, 2021*, Bureau of Justice Statistics (Jan. 2024), https://bjs.ojp.gov/data-breach-notifications-and-identity-theft-2021

102. Further, Plaintiff and Class Members have incurred and will incur out of pocket costs for protective measures, such as identity theft protection, credit monitoring, credit report fees, credit freeze fees, and similar costs related to the Data Breach.

103. Besides the monetary damage sustained in the event of identity theft, consumers may have to spend hours trying to resolve identity theft issues. For example, the FTC estimates that it takes consumers an average of 200 hours of work over approximately six months to recover from identity theft.[32]

104. Plaintiff and Class Members are also at a continued risk because their information remains in Suno's systems, which the Data Breach showed are susceptible to compromise and attack and are subject to further attack so long as Suno fails to take necessary and appropriate security and training measures to protect the Private Information in its possession.

105. Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their Private Information to strangers.

106. As a result of Suno's failure to prevent the Data Breach, Plaintiff and Class Members have suffered and will continue to suffer injuries, including out of pocket expenses; loss of time and productivity through efforts to ameliorate, mitigate, and deal with the future consequences of the Data Breach; theft of their valuable Private Information; the imminent and certainly impeding injury flowing from fraud and identity theft posed by their Private Information being disclosed to unauthorized recipients and cybercriminals; damages to and diminution in value of their Private Information; and continued risk to Plaintiff's and the Class Members' Private

---

[32] Kathryn Parkman, *How to Report identity Theft*, Consumer Affairs (Feb. 17, 2022), https://www.consumeraffairs.com/finance/how-to-report-identity-theft.html (last accessed November 23, 2026).

Information, which remains in the possession of Defendant and which is subject to further breaches so long as Suno fails to undertake appropriate and adequate measures to protect the Private Information entrusted to it.

107. Furthermore, Defendant has not offered identity theft monitoring and/or identity theft protection for its customers. This lack of resolution is inadequate when the victims will likely face many years of identity theft.

108. The absence of these services is wholly inadequate as they fail to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud, and they entirely fail to provide any compensation for the unauthorized release and disclosure of Plaintiff's and Class Members' PII.

## CLASS ALLEGATIONS

109. Plaintiff brings this class action on behalf of himself and all other individuals who are similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.

110. Plaintiff seeks to represent a class of persons to be defined as follows:

> All individuals in the United States whose Private Information was compromised in the Data Breach (the "Class").

111. Excluded from the Class are Suno, its subsidiaries and affiliates, officers and directors, any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

112. This proposed class definition is based on the information available to Plaintiff at this time. Plaintiff may modify the class definition in an amended pleading or when he moves for class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

113. **Numerosity:** Plaintiff is informed and believes, and thereon alleges, that there are at minimum, millions of members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through Defendant's records, including but not limited to the files implicated in the Data Breach.

114. **Commonality:** This action involved questions of law and fact common to the Class. Such common questions include but are not limited to:

a. Whether Defendant had a duty to protect the Private Information of Plaintiff and Class Members;

b. Whether Defendant was negligent in collecting and storing Plaintiff's and Class Members' Private Information, and breached its duties thereby;

c. Whether Plaintiff and Class Members are entitled to damages as a result of Defendant's wrongful conduct; and

d. Whether Plaintiff and Class Members are entitled to restitution as a result of Defendant's wrongful conduct.

115. **Typicality:** Plaintiff's claims are typical of the claims of the members of the Class. The claims of the Plaintiff and members of the Class are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiff and members of the Class were all customers of Defendant, and each had their Private Information exposed and/or accessed by an unauthorized third-party.

116. **Adequacy of Representation:** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the members of the Class. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the members of the Class and has no interests antagonistic to the members of the Class. In addition, Plaintiff has retained

counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiff and the Class Members are substantially identical as explained above.

117. **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

118. **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages are common to Plaintiff and each member of the Class. If Defendant breached its duty to Plaintiff and Class Members, then Plaintiff and each Class member suffered damages by that conduct.

119. **Injunctive Relief:** Defendant has acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. R. Civ. P. 23(b)(2).

120. **Ascertainability:** Members of the Class are ascertainable. Class Membership is defined using objective criteria, and Class Members may be readily identified through Defendant's books and records.

# CLAIMS FOR RELIEF

## COUNT I
## NEGLIGENCE
## (On Behalf of Plaintiff and the Class)

121. Plaintiff re-alleges the above allegations as if fully set forth herein.

122. Plaintiff and Class Members provided their Private Information to Defendant as a condition of obtaining services from Defendant.

123. Defendant owed a duty to Plaintiff and Class Members to exercise reasonable care in securing, safeguarding, storing, and protecting the PII collected from them from being compromised, lost, stolen, accessed and misused by unauthorized parties. This duty includes, among other things, designing, maintaining, overseeing, and testing Defendant's security systems to ensure that PII in Suno's possession was adequately secured and protected.

124. Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and Class Members could and would suffer if their Private Information were wrongfully disclosed.

125. Defendant owed a duty of care to Plaintiff and Class Members to provide reasonable security, consistent with industry standards, to ensure that its systems and networks adequately protected their Private Information.

126. Defendant had a special relationship with Plaintiff and Class Members. Plaintiff's and Class Members' willingness to entrust Suno with their Private Information as a condition of receiving resources was predicated on the understanding that Suno would take adequate security precautions to protect their PII.

127. By assuming the responsibility to collect and store this data, Defendant had duties of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

128. Plaintiff and members of the Class entrusted Defendant with their PII with the understanding that Suno would safeguard their information.

129. Defendant's conduct also created a foreseeable risk of harm to Plaintiff and Class Members by failing to: (1) secure its systems and exercise adequate oversight of its data security protocols; (2) ensure compliance with industry standard data security practices, (3) implement adequate system and event monitoring, and (4) implement the systems, policies, and procedures necessary to prevent the Data Breach.

130. Defendant knew, or should have known, of the risks inherent in collecting and storing PII, the vulnerabilities of its systems, and the importance of adequate security. Defendant should have been aware of numerous, well-publicized data breaches in the months and years preceding the Data Breach.

131. Defendant breached its common law duty to act with reasonable care in collecting and storing the Private Information of its customers, which exists independently from any contractual obligations between the parties. Specifically, Defendant breached its common law, statutory, and other duties to Plaintiff and Class Members in numerous ways, including by:

a. failing to adopt reasonable data security measures, practices, and protocols;

b. failing to implement data security systems, practices, and protocols sufficient to protect Plaintiff's and Class Members' PII;

c. storing former Plaintiff's and Class Members' PII longer than reasonably necessary;

d. failing to comply with industry-standard data security measures; and

e. failing to timely disclose critical information regarding the nature of the Data Breach.

132. Defendant's failure to implement and maintain adequate data security measures to protect Plaintiff's and Class Members' Private Information created conditions conducive to a foreseeable, intentional criminal act in the form of the Data Breach. Plaintiff and Class Members did not contribute to the Data Breach or the subsequent misuse of their Private Information.

133. Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

134. Moreover, Defendant had a duty to promptly and adequately notify Plaintiff and Class Members of the Data Breach.

135. Defendant had and continues to have duties to adequately disclose that the Private Information of Plaintiff and Class Members within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice is necessary to allow Plaintiff and Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

136. Defendant has acknowledged that the Private Information of Plaintiff and Class Members was disclosed to unauthorized third persons as a result of the Data Breach.

137. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and Class Members.

138. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have and will suffer damages including, but not limited to: (i) the loss of value of their Private Information and loss of opportunity to determine for themselves how their PII is used; (ii) the publication and/or theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iv) lost opportunity costs associated with addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest and recover from tax fraud and identity theft; (v) time, effort, and expense associated with placing fraud alerts or freezes on credit reports; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Suno fails to undertake appropriate and adequate measures to protect it; and, (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised for the rest of their lives.

139. But for Defendant's wrongful and negligent breaches of duties owed to Plaintiff and Class Members, the Private Information of Plaintiff and Class Members would not have been compromised.

140. There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiff and Class Members and the harm, or risk of imminent harm, suffered by Plaintiff and Class Members. The Private Information of Plaintiff and Class Members was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

141. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) an increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

142. As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

143. In addition, Suno had a duty to employ reasonable security measures under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

144. Defendant's violation of federal statutes, including the FTC Act, constitutes negligence *per se*.

145. Additionally, as a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Defendant's possession and is subject to

further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

146. Plaintiff and Class Members are therefore entitled to damages, including restitution and unjust enrichment, declaratory and injunctive relief, and attorneys' fees, costs, and expenses.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class)**

147. Plaintiff re-alleges the above allegations as if fully set forth herein.

148. In connection with obtaining services from Defendant, Plaintiff and Class Members entered into implied contracts with Suno.

149. Plaintiff and Class Members were required to deliver their Private Information to Defendant as part of the process of obtaining services from Defendant.

150. Defendant required Class Members to provide their Private Information in order to obtain services from Defendant. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

151. Defendant accepted possession of Plaintiff's and Class Members' Private Information for the purpose of providing services to Plaintiff and Class Members.

152. When Plaintiff and Class Members provided their PII to Suno, either directly or indirectly, as a pre-condition for services, they entered into implied contracts with Suno.

153. Pursuant to these implied contracts, in exchange for the consideration and PII provided by Plaintiff and Class Members, Defendant agreed to, among other things, and Plaintiffs and Class Members understood that Suno would: (1) provide products and/or services to Plaintiffs and Class Members; (2) implement reasonable measures to protect the security and confidentiality

of Plaintiff's and Class Members' PII; and (3) protect Plaintiff's and Class Members' PII in compliance with federal and state laws and regulations and industry standards

154. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

155. Implicit in the agreement between Plaintiff and Class Members and Defendant to provide Private Information, was the latter's obligation to: (a) use such Private Information for business purposes only, (b) take reasonable steps to safeguard that Private Information, (c) prevent unauthorized disclosures of the Private Information, (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information, (e) reasonably safeguard and protect the Private Information of Plaintiff and Class Members from unauthorized disclosure or uses, and (f) retain the Private Information only under conditions that kept such information secure and confidential.

156. The protection of PII was a material term of the implied contracts between Plaintiff and Class Members, on the one hand, and Defendant, on the other hand. Indeed, as set forth herein, Defendant recognized its duty to provide adequate data security and ensure the privacy of its customers' PII with its practice of providing a privacy policy on its website.

157. Plaintiff and Class Members performed their obligations under the implied contract when they provided Defendant with their PII.

158. Defendant breached its obligations under its implied contracts with Plaintiff and Class Members in failing to implement and maintain reasonable security measures to protect and secure their PII and in failing to implement and maintain security protocols and procedures to

protect Plaintiff's and Class Members' PII in a manner that complies with applicable laws, regulations, and industry standards.

159. The mutual understanding and intent of Plaintiff and Class Members on the one hand, and Defendant, on the other, is demonstrated by their conduct and course of dealing.

160. On information and belief, at all relevant times, Defendant promulgated, adopted, and implemented written privacy policies whereby it expressly promised Plaintiff and Class Members that it would only disclose Private Information under certain circumstances, none of which relate to the Data Breach.

161. On information and belief, Defendant further promised to comply with industry standards and to make sure that Plaintiff's and Class Members' Private Information would remain protected.

162. Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

163. Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of their implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

164. Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

165. Defendant breached the implied contracts it made with Plaintiff and the Class by failing to safeguard and protect their Private Information, by failing to delete the information of Plaintiff and the Class once the relationship ended, and by failing to provide accurate notice to them that Private Information was compromised as a result of the Data Breach.

166. Defendant breached the implied contracts by failing to maintain adequate computer systems and data security practices to safeguard Private Information, failing to timely and accurately disclose the Data Breach to Plaintiff and Class Members and continued acceptance of Private Information and storage of other personal information after Defendant knew, or should have known, of the security vulnerabilities of the systems that were exploited in the Data Breach.

167. Defendant's breach of its obligations of its implied contracts with Plaintiff and Class Members directly resulted in the Data Breach and the injuries that Plaintiff and Class Members have suffered from the Data Breach.

168. Plaintiff and Class Members suffered by virtue of Defendant's breach of their implied contracts because: (i) they paid for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft - risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII has been breached; (v) they were deprived of the value of their PII, for which there is a well-established national and international market; (vi) they have lost time and incurred expenses, and will incur future costs to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (vii) they have overpaid for the services they received without adequate data security.

169. Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

170. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit

to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**COUNT III**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**(On Behalf of Plaintiff and the Class)**

171. Plaintiff re-alleges the above allegations as if fully set forth herein.

172. Every contract in the state of Massachusetts has an implied covenant of good faith and fair dealing. This implied covenant is an independent duty and may be breached even when there is no breach of a contract's actual and/or express terms.

173. Plaintiff and Class Members have complied with and performed all conditions of their contracts with Defendant.

174. Defendant breached the implied covenant of good faith and fair dealing by failing to maintain adequate computer systems and data security practices to safeguard PII, failing to timely and accurately disclose the Data Breach to Plaintiff and Class Members, and continued acceptance of PII and storage of other personal information after Defendant knew or should have known of the security vulnerabilities of the systems that were exploited in the Data Breach.

175. Defendant acted in bad faith and/or with malicious motive in denying Plaintiff and Class Members the full benefit of their bargains as originally intended by the parties, thereby causing them injury in an amount to be determined at trial.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

176. Plaintiff re-alleges the above allegations as if fully set forth herein.

177. This count is plead in the alternative to the breach of implied contract count above.

178. By its wrongful acts and omissions described herein, Defendant has obtained a benefit by unduly taking advantage of Plaintiff and Class Members.

179. Plaintiff and Class Members conferred a benefit on Defendant, whereby they provided their Private Information to Defendant in connection with receiving certain services.

180. Defendant prior to and at the time Plaintiff and Class Members entrusted it with their PII, caused Plaintiff and Class Members to reasonably believe that it would keep that Private Information secure.

181. The monies Defendant was paid in its ordinary course of business included a premium for Defendant's cybersecurity obligations and were supposed to be used by Defendant, in part, to pay for the administrative and other costs of providing reasonable data security and protection for Plaintiff's and Class Members' Private Information.

182. Defendant knew that Plaintiff and Class Members conferred a benefit upon it and accepted and retained that benefit by accepting and retaining the Private Information entrusted to it. Defendant profited from Plaintiff's retained data and used Plaintiff's and Class Members' Private Information for business purposes.

183. Defendant failed to disclose facts pertaining to its substandard information systems, or defects and vulnerabilities therein before Plaintiff and Class Members made their decisions to provide Defendant with their Private Information.

184. Defendant enriched itself by hoarding the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant calculated to increase its own profit at the expense of Plaintiff and Class Members by utilizing cheap, ineffective security measures and diverting those funds to its own personal use. Plaintiff

and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their Private Information.

185. Defendant failed to provide reasonable security, safeguards, and protections to the Private Information of Plaintiff and Class Members, and, as a result, Defendant was overpaid.

186. Under principles of equity and good conscience, Defendant should not be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

187. Plaintiff and Class Members have no adequate remedy at law.

188. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) an increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

189. Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct. This can be accomplished by establishing a constructive trust from which Plaintiff and Class Members may seek restitution or compensation.

## COUNT V
## DECLARATORY JUDGMENT
## (On Behalf of Plaintiff and the Class)

190. Plaintiff re-alleges the above allegations as if fully set forth herein.

191. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

192. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' Private Information and whether Suno is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII. Plaintiff alleges that Suno's data security measures remain inadequate. Furthermore, Plaintiff continues to suffer injury as a result of the compromise of his PII and remains at imminent risk that further compromises of his PII will occur in the future.

193. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Suno owes a legal duty to secure customers' Private Information and to timely notify impacted individuals of a data breach under the common law, and various state statutes; and

b. Suno continues to breach this legal duty by failing to employ reasonable measures to secure Private Information in its possession.

194. This Court also should issue corresponding prospective injunctive relief requiring Suno to employ adequate security protocols consistent with law and industry standards to protect Private Information in Suno's data network.

195. If an injunction is not issued, Plaintiff will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Suno. The risk of another such breach is real, immediate, and substantial. If another breach at Suno occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and he will be forced to bring multiple lawsuits to rectify the same conduct.

196. The hardship to Plaintiff if an injunction is not issued exceeds the hardship to Suno if an injunction is issued. Plaintiff will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Suno of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Suno has a pre-existing legal obligation to employ such measures.

197. Issuance of the requested injunction will not disserve the public interest. In contrast, such an injunction would benefit the public by preventing another data breach at Suno, thus eliminating the additional injuries that would result to Plaintiff and customers whose confidential information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. For an Order certifying this action as a class action, appointing Plaintiff as class representative for the Class, and appointing his counsel to represent the Class;

B. For equitable relief enjoining Suno from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' PII, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C. For equitable relief compelling Suno to utilize appropriate methods and policies with respect to customer data collection, storage, and safety, and to disclose with specificity the types of PII compromised as a result of the Data Breach;

D. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Suno's wrongful conduct;

E. Ordering Suno to pay for not less than ten years of credit monitoring services for Plaintiff and Class Members;

F. For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

G. For an award of punitive damages, as allowable by law;

H. For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

I. Pre- and post-judgment interest on any amounts awarded; and

J. Such other and further relief as this court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.

Dated: November 25, 2026

Respectfully submitted,

*/s/ David Pastor*

**PASTOR LAW OFFICE, PC**
David Pastor (BBO No. 391000)
63 Atlantic Avenue, 3rd Floor
Boston, Massachusetts 02110
Telephone: (617) 742-9700
dpastor@pastorlawoffice.com

***Interim Liaison Counsel***

**LYNCH CARPENTER, LLP**
Gerald D. Wells, III
Stephen E. Connolly
1760 Market Street, Suite 600
Philadelphia, PA 19103
T: 267-609-6910
F: 267-609-6955
jerry@lcllp.com
steve@lcllp.com

***Interim Co-Lead Class Counsel***

Nicholas Andrew Hall
Texas Bar No. 24069863
**HALL ATTORNEYS, P.C.**
P.O. Box 1370
Edna, Texas 77957
Telephone: (713) 428-8967
nhall@hallattorneys.com
*Interim Co-Lead Class Counsel*

***Attorneys for Plaintiff and the Proposed Class***

**CERTIFICATE OF SERVICE**

**I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on November 25, 2026.**

/s/ David Pastor
David Pastor